IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF FLORIDA
GAINESVILLE DIVISION

JOHN DOE,

      Plaintiff,

v.                                       CASE NO. 1:11-cv-00275-MP-GRJ

ONEBEACON AMERICA
INSURANCE COMPANY,

      Defendant.

_____/

# O R D E R

This matter is before the Court on the parties' cross Motions for Summary Judgment

(docs. 76 and 77) and Responses in Opposition thereto (docs. 89 and 92).  The parties have also

filed statements of material facts (docs. 78, 79) and responses thereto (docs. 87 and 93).

Defendant OneBeacon America Insurance Company ("OneBeacon") has also filed a Reply to

Plaintiff's Response to Defendant's motion, to which Plaintiff filed a Sur-Reply.  (Docs. 103 and

104).  Plaintiff, John Doe ("Doe"), prevailed in a related state court action and obtained

judgments against the following parties: the Roman Catholic Diocese of Savannah; Raymond W.

Lessard; J. Kevin Boland (collectively "the Diocese");[1] and Wayland Yoder Brown.  Doe claims

that these parties held a contract of insurance with Onebeacon and that they assigned to Doe any

and all rights thereunder.

---

[1] At various times throughout both the underlying litigation as well as in the pleadings
and briefs in the instant suit, the parties have used the phrase "the Diocese" to refer either to the
Diocese of Savannah individually or to the Diocese of Savannah, Lessard, and Boland,
collectively.  For purposes of this Order, unless those parties are listed out and/or named
individually, the phrase "the Diocese" shall be used to refer to this group collectively.

Doe seeks a declaratory judgement that these parties were insured by OneBeacon and that OneBeacon owed them duties of defense and indemnification in the underlying action. (Doc. 1, Count I).  Doe also claims that OneBeacon breached the insurance policy and acted in bad faith.  (Doc. 1, Counts II–IV).[2]  For the reasons stated herein, the Court finds that the cross-motions for summary judgment should each be granted in part and denied in part, and that final judgment should be entered in OneBeacon's favor.

BACKGROUND[3]

Because this matter is before the Court on the parties' cross motions, the Court must evaluate each individual motion on its own merits, viewing the evidence in favor on the nonmoving party in each instance.  *See Shaw Constructors v. ICF Kaiser Eng'rs, Inc.*, 395 F.3d 533, 538–39 (5th Cir. 2004); *Avocent Huntsville Corp. v. ClearCube Tech., Inc.*, 443 F. Supp. 2d 1284, 1293–94 (N.D. Ala. 2006).  However, the following facts are uncontroverted.

Beginning on February 10, 1976 and lasting through February 10, 1979, OneBeacon, known previously as Commercial Union Insurance Company, provided liability insurance coverage to the Diocese, pursuant insurance policy No. CZ9745-001 ("the Policy").  *See* Doc. 4, Exs. A1–A3; Doc. 79, Ex. A.  The Policy listed the "named insured" as "Most Rev. Raymond W. Lessard[,] Roman Catholic Bishop of Savannah and/or His Successors in Office[,] Savannah,

---

[2] On May 8, 2012, the Court granted in part and denied in part Defendant's motion to dismiss, or in the alternative, abate counts II, III, & IV of Plaintiff's Complaint (Docs. 8, 12). The Court abated Counts III and IV as well as Count II insofar as it alleged bad faith on the part of OneBeacon.  The Court abated these Counts pending resolution of the declaratory judgment in Count I and the underlying breach of contract alleged in Count II.

[3] The following facts are constructed from the parties' briefings and supporting evidence and are set forth only for the purpose of resolving the parties' pending motions.  They do not constitute findings of fact made by the Court.  If a trial is ultimately necessary, facts adduced thereat may differ from the facts set forth in this Order.

Georgia."  Doc. 79, Ex. A at 1.  It also listed the Diocese as a named insured.  *Id.*  It further

stated that "[i]f the named insured is designated in the declarations as other than an individual,"

the Policy would insure "the organization so designated and any executive officer . . . [or]

directors . . . thereof while acting within the scope of his duties as such."  *Id.* at 9–10.  Brown

was not explicitly listed in the Policy as an insured; regardless, the parties do not dispute that the

Policy insured Brown, and the Court finds that, based on the language quoted above, the Policy

did in fact insure Brown as an executive officer of the Diocese of Savannah.

Concerning coverage, the Policy provided that OneBeacon would "pay on behalf of the

insured all sums, which the insured shall become legally obligated to pay as damages because of

bodily injury or property damage to which this insurance applies, caused by an occurrence . . . ."

*Id.* at 9, 35.  It further provided that OneBeacon "shall have the right and duty to defend any suit

against the insured seeking damages on account of such bodily injury . . . and may make such

investigation and settlement of any claim or suit as it deems expedient."  *Id.*  It defined

"occurrence" as "an accident, including continuous exposure to conditions, which results in

bodily injury or property damage neither expected nor intended from the standpoint of the

insured."  *Id.* at 60.  The Policy provided bodily injury liability limits of $300,000.00 per

occurrence.  *Id.* at 8.

The Policy also imposed a cooperation agreement on the insureds.  The Policy required

that the insureds "cooperate with the Company and, upon the Company's request, assist in

making settlements [and] in the conduct of suits . . . ."  *Id.* at 64.  It further specified that an

"insured shall not, except at his own cost, voluntarily make any payment, assume any obligation

or incur any expense other than for first aid to others at the time of the accident."  *Id.*

On or about March 4, 2010, Doe brought action against OneBeacon's insureds, including

the Diocese of Savannah, Lessard, Bolland, and Brown, in Case No. 16-2010-CA-3300, in the Circuit Court of the Fourth Judicial Circuit in and for Duval County, Florida.  *See* Doc. 77, Ex. A; Doc. 79, Ex. B (the "Underlying Complaint").  According to the Underlying Complaint, sometime around 1972, Brown requested to be accepted as a seminarian for the Diocese.  *Id.* at ¶ 45.  Sometime thereafter, the Diocese "conducted an investigation before accepting Brown as a seminarian."  *Id.* at ¶ 46.

Between 1972 and Brown's ultimate ordination and employment in 1977 as a Roman Catholic Priest, clergy and others repeatedly warned, notified, and advised the Diocese of "grave concerns regarding . . . BROWN's danger to children."  *Id.* at ¶ 48.  For example, in 1974, the Diocese was allegedly "informed and/or notified of questionable sexual misconduct between BROWN and young boys."  *Id.* at ¶ 51.  In 1975, Brown himself allegedly admitted to Lessard that he had committed "various indiscretions with minor boys."  *Id.* at ¶ 53.  Finally, sometime prior to Brown's ordination as a Priest, the Diocese received reports and/or notifications of incidents involving Brown and minor boys.  According to the alleged reports, one boy was "traumatized" by Brown while another required psychological care as a result.  *Id.* at ¶ 59.

In short, Doe alleged that the Diocese "knew or should have known" of information concerning Brown's "inappropriate conduct and dangerous propensities regarding young boys." *Id.* at ¶¶ 47, 122, 130, 131.  "Despite this knowledge and information, [the underlying defendants] took no action to remove BROWN from the seminary program, to otherwise deter or prevent him from moving forward with his goal and plans of priesthood, to warn those children that were reasonably foreseeable to be in danger or their parents of such knowledge, or to control and/or supervise BROWN in any way."  *Id.* at ¶ 51.

While Doe was a minor, he and his family attended Catholic churches, schools, services,

and programs offered by the Diocese.  *Id.* at ¶¶ 65, 66.  At all relevant times, Brown acted as a

confessor, counselor, and moral and spiritual advisor to Doe, and Doe allegedly admired, trusted,

revered, and respected Brown.  *Id.* at ¶¶ 73, 75, 76.  In the summer of 1978, Brown offered to

take Doe on what became a month-long trip through Georgia, South Carolina, and Florida.

While on the trip, Brown sexually molested Doe on multiple occasions.  *See* Doc. 79, Ex. B at ¶¶

91, 95, 96, 98, 110, 111.  "Prior to, during, and after various episodes of sexual molestation[,] . . .

BROWN would perform his priestly duties with [Doe] and would have on his priestly attire,

collar, and/or cross, pray with [Doe] and discuss confession, the sacraments, Catholicism, and

the morals and teachings of the Catholic faith."  *Id.* at ¶¶ 96, 99, 101.  As a result of the acts and

omissions of Brown, Doe allegedly suffered severe emotional distress resulting in bodily injury.

*See  id.* at ¶¶ 114, 116.

Based on these factual allegations concerning Brown and the Diocese, Doe pursued the

following eight counts against the insureds: (Count I) Intentional Infliction of Emotion

Distress/Outrage; (Count II) Negligent Hiring and Retention; (Count III) Negligent Supervision;

(Count IV) Fraud (Non-Disclosure of Material Facts/Fraudulent Concealment); (Count V)

Negligence/Gross Negligence/Recklessness; (Count VI) Breach of Fiduciary Duty; (Count VII)

Civil Conspiracy; and (Count VIII) Loss of Consortium by Doe's wife.

On November 18, 2011, the state court entered an order ("Brown Final Judgment")

granting Doe's motion for final summary judgment and awarding Doe $50 million against

Brown.  *See* Doc. 4, Ex. C.  The court found that Brown repeatedly engaged in various acts of

sexual molestation of Doe while on the trip; however, rather than basing damages on the sexual

molestation, the court concluded that "Brown's negligent counseling, failure to warn, and failure

to provide adequate safeguards to protect Doe" constituted "the sole proximate cause of Doe's

damages." *Id.* at 5–6, 8–9.  In other words, the sexual abuse was simply a result brought about "naturally and unavoidably from Brown's negligent failure to warn, safeguard, or otherwise take appropriate action under the circumstances."  *Id.* at 8.

Turning to OneBeacon's involvement, on January 26, 2010, prior to the filing of the Underlying Complaint, OneBeacon, through its third-party administrator, Resolute Management ("Resolute"), sent a letter to Joseph Brennan, attorney for the Diocese.  *See* Doc. 79, Ex. C. OneBeacon agreed to participate in the investigation of Doe's claims under a reservation of rights.  If the investigation revealed that the allegations did not constitute a claim under the Policy, OneBeacon would not provide coverage.  *Id.* at 1–2.  Further, the letter cautioned that "[a]ny voluntary payments made by the insured" would be "at the sole cost to the insured."  *Id.* at 4.

On April 30, 2010, after Doe filed the Underlying Complaint, Resolute sent a second letter to Brennan, reiterating these points and offering to provide a defense subject to a complete reservation of rights.  The letter further reiterated that the defense would be limited by the terms, exclusions, and conditions of the Policy.  *See* Doc. 79, Ex. D at 1.  The letter also reiterated the voluntary payments provision of the Policy.  *Id.* at 3–4.  Resolute also explained that OneBeacon had no duty to defend Brown.  OneBeacon maintained that the allegations against Brown were intentional in nature and, as such, would not constitute a covered occurrence.  Consequently, OneBeacon would not provide any coverage to Brown.  *Id.* at 2–3.  Throughout the underlying litigation, OneBeacon never provided nor offered to provide Brown with a defense.

Subsequent to receiving this second reservation of rights letter, the Diocese accepted OneBeacon's defense.  *See* Doc. 79, Ex. E at 12–13.  Throughout the litigation, OneBeacon paid the defense costs incurred by attorney Brennan.  *See id.* at 14.  OneBeacon also retained attorney

Gerald Weedon to defend the Diocese as Brennan's co-counsel.  *See id.* at 15.

On September 14, 2010, Resolute wrote an e-mail to Brennan on behalf of OneBeacon. *See* Doc. 79, Ex. F.  On August 24, 2010, defense counsel had advised Resolute that the parties had scheduled a voluntary mediation for September 17, 2010.  *Id.* at 1.  According to Resolute's e-mail, Brennan orchestrated the mediation "without consulting with OneBeacon or obtaining OneBeacon's permission."  *Id.*  "Both before and after the mediation was scheduled," Resolute had indicated to Weedon "that OneBeacon had not been provided with the information necessary to evaluate the claim and would need to receive and be afforded a reasonable opportunity to review this information before agreeing to mediate this case."  *Id.*  Examples of such information included the following: (1) review of a written summary prepared by Weedon of Doe's depositions, along with video copies of the depositions; (2) review of certain analysis prepared by defense counsel "on several liability issues, including U.S.C. § 526, Servicemembers Civil Relief Act, and the Georgia charitable immunity doctrine;" (3) the elements of Doe's damages claims, which, at that time, Doe had failed to identify; (4) "[a] choice-of-law analysis with respect to whether Georgia or Florida law would apply to potential liability defenses, e.g., statute of limitations and charitable immunity, with assigned probabilities;" and (5) "defense counsel's evaluation of any verdicts, judgments or settlements in cases with comparable liability and damages fact patterns in Duval County."  *Id.*

The e-mail advised that due to this lack of "critical information on key aspects of the claim," OneBeacon would be "unable to complete [its] claim evaluation in advance of the [mediation]."  As such, Resolute requested that defense counsel delay the mediation. OneBeacon was, however, "willing to consider participating in a mediation of the case in the near future" if it subsequently obtained the information necessary to complete its evaluation.  *Id.*

The e-mail also indicated that defense counsel Weedon had previously advised OneBeacon that settlement of the suit should be valued at $1,500,000.00.  *Id.* at 2.

Finally, the e-mail advised that pursuant to the Policy, the Diocese did "not have the right to unilaterally dictate how suits are defended and how claims are settled."  Instead, such rights belonged to OneBeacon.  The e-mail directed Brennan to the pertinent language from the Policy, specifically the clauses detailing OneBeacon's right and duty to control the defense and settlement, the Diocese's duty to cooperate, and the voluntary payment provision.  *Id.* at 1–2.  The e-mail explicitly warned that should the Diocese continue "ignoring OneBeacon's right to settle and defend . . . and proceed with mediation," OneBeacon "reserve[d] the right to disclaim coverage under the cooperation condition."  Further, OneBeacon "reserve[d] the right to regard any settlement entered into as a voluntary payment for which OneBeacon [would have] no indemnification obligation."  *Id.* at 2.

On September 15, 2010, Brennan responded to Resolute with his own e-mail.  *See* Doc. 79, Ex. E at 21–22; Ex. G.  Brennan acknowledged OneBeacon's right to control the defense of the case, advising that although he and Weedon "endorsed the idea to mediate . . . it was not with the intent to interfere with the defense of [the] case by OneBeacon and Resolute."  Doc. 79, Ex. G at 1.  The e-mail further advised that the Diocese would "cooperate as required by the terms of the contract."  *Id.*  However, the e-mail requested that OneBeacon consider the interests of the Diocese paramount to its own.  *Id.*

At all material times, the Diocese also retained "coverage counsel" Joseph Barrow.  *See* Doc. 92, Ex. 1.  On October 27, 2010, Barrow sent a letter to Resolute, arguing that OneBeacon had acted negligently and in bad faith in its defense of the Diocese.  *Id.* at 3.  Barrow noted that resolution of the case prior to a jury trial would be in the Diocese's best interest so as to avoid

"attendant publicity" and "inevitable costs." *Id.* He also argued that the Policy limits were "not sufficient to resolve" the case. *Id.* In light of these considerations, Barrow argued that by refusing to allow the Diocese to engage in mediation and/or settlement negotiations, OneBeacon was placing its financial interests ahead of those held by the Diocese, in violation of the duty to defend. *Id.* He concluded that such was the "definition of bad faith." *Id.*

Subsequently, at least as early as December 6, 2010, the parties resumed settlement negotiations. *See* Doc.79, Ex. E at 22–29; Ex. H; Doc. 93 ¶ 10. At his deposition, Brennan testified that in exchange for a settlement, Doe's counsel "wanted an assignment of any claims that the Diocese might have to go against OneBeacon." Doc. 79, Ex. E at 26–27. However, Doe's counsel believed that, "to preserve any future claim against [OneBeacon], the Diocese must in explicit terms reject the defense being provided." Doc. 79, Ex. H at 1; *see also* Doc. 79, Ex. E at 22–23. Doe's counsel provided Brennan with "proposed language" that Doe's counsel believed was "necessary . . . to accomplish that rejection." Doc. 79, Ex. H at 1; Ex. E at 29–31.

Brennan also testified that "OneBeacon was not knowledgeable about the efforts to settle the case" as OneBeacon had advised him "not to enter into any negotiations," including "[m]ediation or settlement discussions." Doc. 79, Ex. E at 29–30. Brennan believed that there would be ramifications for defying OneBeacon's instructions, including that settlement would violate the cooperation clause, rendering coverage voidable under the Policy. *Id.* at 30–31, 33–35. Despite this, both the Diocese and Brennan wanted to settle the case. *Id.* at 30.

On December 7, 2010, Doe's counsel indicated to Brennan that a settlement agreement could not be finalized until the Diocese sent a letter to OneBeacon "formally and explicitly" advising that the Diocese was "rejecting the defense being provided." Doc. 79, Ex. I at 1. Doe's counsel noted that Brennan would need to use language at least "very similar" to the language

previously proposed.  *Id.*

On December 8, 2010, attorney Barrow wrote a second letter to Resolute, again arguing that OneBeacon had "breached its fiduciary duties" and had "not acted in good faith" in providing the defense.  Doc. 79, Ex. J at 2.  The letter claimed that OneBeacon had "failed to properly advise the insureds of reasonable settlement opportunities, and . . . [had] actively prohibited and impeded the insureds ability to reach a reasonable settlement by refusing to negotiate settlement in good faith and instructing the insureds not to participate in a mediation that was previously scheduled to take place in September, 2010, and not to enter into or engage in settlement discussions/efforts."  *Id.*[4]

Barrow further argued that OneBeacon's refusal to allow the Diocese to engage in settlement negotiations was "exactly the opposite" of instructions that OneBeacon provided to the Diocese in the defense of a similar case filed by claimant Carl Ranta against the Diocese and Brown in South Carolina.  *Id.*  According to the letter, in the Ranta Case, OneBeacon allowed the Diocese "to negotiate [a] settlement on the best terms possible" because OneBeacon "was never going to pay enough money under [the subject policy] to resolve the case."  *Id.*  The letter argued that, by taking the opposite approach to settlement in this case, OneBeacon was subjecting the Diocese to "a potentially disastrous verdict" that could far exceed the Policy's

---

[4] The letter also claimed that OneBeacon breached its duty to defend by failing "to promptly pay all of the insureds' litigation attorney's fees and costs."  Doc. 79, Ex. J at 2.  It is unclear as to what attorney's fees and/or costs this letter references.  Barrow's first letter made no mention of a failure to pay attorney's fees/costs.  Regardless, in his pleadings and briefs, Doe has made no arguments nor presented any evidence concerning an alleged failure to pay by OneBeacon.  Instead, Doe appears to concede this point and argues only that OneBeacon breached its duty to defend and/or acted in bad faith by failing to adequately engage in settlement negotiations, refusing to allow the Diocese to participate in the September 2010 mediation, and, more broadly, wrongfully refusing to settle the underlying case.

indemnification limits.  *Id.*

Barrow demanded that OneBeacon tender the entire Policy limits, totaling $300,000,

within five (5) business days of the date of the letter.  *Id.* at 2–3.  Failure to comply would result

in the Diocese rejecting OneBeacon's defense and taking control of the litigation, so as to protect

the Diocese's "liability exposure and to make the best deal" with Doe, even if that meant

"settling the case in excess of the insurance coverage limits."  *Id.* at 3.  The letter also advised

that the Diocese would no longer require the services of attorney Weedon.  *Id.*

As of December 8, 2010, an agreement had been reached between Doe and the Diocese

as to the amount that the Diocese would contribute towards a settlement.  *See* Doc. 79, Ex. E at

38–39; Ex. K at 1.  Attorney Brennan believed that the parties had "everything in order"

regarding the settlement, save for how the Diocese should cut the various checks.  Doc. 79, Ex.

K.  However, according to both Doe and Doe's counsel, a final settlement had not been reached

at that time as to all material terms.  Instead, the settlement was contingent upon Doe accepting a

written apology from the Diocese.  *See* Doc. 92, Ex. 2 at 3–4; Ex. 7.

On December 10, 2010, Resolute responded to attorney Barrow's original letter from

October 27, 2010,[5] denying Barrow's allegations and arguing that OneBeacon had "promptly and

reasonably considered any and all proposed attempts to resolve this case through mediation or

other means."  *See* Doc. 79, Ex. L at 1.  Resolute reiterated OneBeacon's position that the

posture of the case both at the time of the proposed mediation and as of December 10, 2010 was

---

[5] Although Resolute sent the letter in response to Barrow's October 27th letter, Resolute
acknowledged receipt of Barrow's December 8th letter and indicated that it would respond to the
second letter "in due course."  Doc. 79, Ex. L at 5.  Regardless, aside from Barrow's five-day
ultimatum for Policy limits, Resolute's letter appears to respond to all the substantive issues in
Barrow's December 8th letter.

not "appropriate for mediation." *Id.*  First, the parties were still awaiting the outcome of an

appeal of the trial court's order denying the Diocese's motion to dismiss, which was based on a

lack of personal jurisdiction. *Id.* at 2.  According to Resolute, Doe's case would "be seriously

weakened" if the appellate court decided in the Diocese's favor.  Further "[a]t the time of the

proposed mediation, defense counsel was of the opinion that the Court of Appeal would reverse

the trial court." *Id.*  Second, if the appeal failed, defense counsel would argue for the first time

that Georgia's two-year statute of limitations period should apply.  If the argument proved

successful, the limitations period would "bar the Plaintiff's claims as to all defendants," resulting

in no exposure. *Id.*

Given these "substantial legal uncertainties," as well as "the limited amount of

discovery" completed to that date regarding Doe's "economic damages claim," OneBeacon

continued to believe that Barrow's significant valuation of the case, let alone a valuation at the

Policy's limits, was premature. *Id.* at 3.  To that end, the letter reiterated OneBeacon's right to

control the defense, as well as the Diocese's obligations under the cooperation clause and the

voluntary payment clause. *Id.* at 3–4.  The letter also noted that OneBeacon had neither

withdrawn nor threatened to withdraw the defense it had provided to the Diocese, nor had it

refused to indemnify the Diocese. *Id.*  Finally, Resolute noted that OneBeacon held a

"willingness to consider all reasonable options . . . to resolve [the] matter," but only once it had

"the necessary information to complete [its] liability and damages evaluation and [to] reasonably

and realistically assess any future demand" by Doe.

In spite of OneBeacon's wishes, the settlement continued forward.  On December 15,

2010, Doe accepted the Diocese's written apology and executed a Settlement Agreement and

Release.  Doc. 79, Ex. M at 4–13.  In consideration for release of the underlying defendants

(except for Brown), the defendants (except for Brown) agreed to pay Doe a sum of

$2,250,000.00. *Id.* at 10. The settling defendants also agreed to assign to Doe any rights they

might have against OneBeacon. *Id.* at 10 n.1.

Thereafter, all underlying parties except for Brown executed a Joint Stipulation and

Agreement, attaching thereto a proposed Final Judgment and Order Approving Settlement for the

state court. *See* Doc. 79, Ex. N. The Agreement set the "total amount of damages" at $5 million

for compensable actual personal injury damages. *Id.* at 3. Of this $5 million, the Diocese paid

$2.5 million to Doe and his wife. *See* Doc. 79, Ex. E at 45–47. Finally, the settling defendants

unconditionally and irrevocably assigned to Doe "all rights, claims, actions, or causes of action"

they had against OneBeacon "arising out of or in any way related to the subject matter of" the

underlying lawsuit. Doc. 79, Ex. N at 3. On January 19, 2011, the state court entered an Order

Approving the Joint Stipulation and Agreement and an Order of Final Judgment. Doc. 79, Ex.

O.

On January 27, 2011, Doe's counsel wrote to Resolute and advised it of the above-

mentioned settlement. *See* Doc. 79, Ex. P. The letter noted that the Diocese had assigned to Doe

its rights against OneBeacon arising out of the underlying litigation. The letter argued that

OneBeacon breached its fiduciary duties by "actively prohibit[ing] and imped[ing] the

insureds['] ability to reach a reasonable settlement by refusing to negotiate settlement in good

faith." *Id.* at 1.

Subsequently, on December 21, 2011, Doe filed the instant four-count Complaint against

OneBeacon. (Doc. 1). The Complaint sought a declaratory judgment as to coverage under the

Policy. *Id.* at Count I. It also alleged that OneBeacon breached the terms of the Policy and acted

in bad faith as a result of OneBeacon's handling of underlying settlement negotiations and the

scheduled mediation. *Id.* at Counts II–IV. On May 8, 2012, the Court abated Counts III and IV

as well as Count II insofar as it alleged bad faith on the part of OneBeacon. *See* Doc. 12.

Accordingly, Doe now seeks partial summary judgment as to his requested declaratory

relief in Count I and still pending breach of contract claim in Count II. (Doc. 77). Doe requests

that the Court find the following: (1) The Diocese is a named insured under the Policy; (2)

Brown is insured under the Policy; (3) The negligent hiring, retention, and supervision of Brown

by the Diocese is an occurrence under the Policy; (4) The negligence of Brown, as established in

the underlying action, is an occurrence under the Policy; (5) The Diocese did not violate the

cooperation clause by rejecting the defense provided by OneBeacon; and (6) The Policy

provided coverage for the claims asserted by Doe and articulated in the Diocese Final Judgment

and the Brown Final Judgment. *See* Doc. 77 at 20.

Concerning Brown, Doe argues that the negligence claims asserted in the underlying

complaint were sufficient to bring those claims within the Policy's definition of an occurrence.

Because OneBeacon failed to provide Brown with a defense, Doe argues the state court's

findings of negligent counseling and negligent failure to warn in the Brown Final Judgment are

binding on OneBeacon. Concerning the Diocese, Doe argues that although OneBeacon provided

the Diocese with a defense subject to a reservation of rights, the Diocese was entitled to reject

that defense and take control of the defense without breaching the Policy's cooperation and

voluntary payment clauses, in light of OneBeacon's handling of the settlement negotiations and

mediation. Moreover, Doe argues that OneBeacon's handling of the settlement negotiations

breached OneBeacon's obligations under the Policy as it constituted either an inadequate defense

or a material change in the terms and conditions of the defense

OneBeacon, on the other hand, seeks a final summary judgment that neither Brown nor

the Diocese were entitled to coverage for the underlying claims.  Specifically, OneBeacon claims

that the allegations in the underlying complaint were not sufficient to satisfy the Policy's

definition of occurrence.  Further, even assuming that the allegations against the Diocese

constituted an occurrence, the Diocese breached the cooperation clause by taking control of the

litigation, thereby relieving OneBeacon of its obligations under the Policy.

## STANDARD OF REVIEW

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  FED. R. CIV. P.

56(a).  The Court must draw all inferences from the evidence in a light most favorable to the

non-movant and resolve all reasonable doubts in that party's favor.  *See Porter v. Ray*, 461 F.3d

1315, 1320 (11th Cir. 2006).  The moving party bears the initial burden of showing the Court, by

reference to materials on file, that there are no genuine issues of material fact that should be

decided at trial.  *See id.*  When a moving party has discharged this burden, the non-movant must

then go beyond the pleadings and designate specific facts, either by its own affidavits or by

depositions, answers to interrogatories, and/or admissions on file.  *Id.*  "'Where the record taken

as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no

genuine issue for trial.'"  *Scott v. Harris*, 550 U.S. 372, 380 (2007) (quoting *Matsushita Elc.

Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586–87 (1986)).

As noted above, this matter is currently before the Court on the parties' cross-motions for

summary judgment.  This fact "does not give rise to any presumption that no genuine issues of

material fact exist."  *Byce v. Pruco Life Ins. Co.*, No. 1:09-CV-1912-RWS, 2011 WL 233390, at

*3 (N.D. Ga. Jan. 21, 2011).  However, if both parties "proceed on the same legal theory and rely

on the same material facts," then "the case is ripe for summary judgment."  *Shook v. United*

*States*, 713 F.2d 662, 665 (11th Cir. 1983).

DISCUSSION

Because this Court's jurisdiction is based on diversity, the Court must apply the

substantive law of the forum state unless federal constitutional or statutory law compels a

contrary result.  *See, e.g.*, *Admiral Ins. Co. v. Feit Mgmt. Co.*, 321 F.3d 1326, 1328 (11th Cir.

2003).  This includes the forum's conflict of laws principles.  *O'Neal v. Kennamer*, 958 F.2d

1044, 1046 (11th Cir. 1992).  Where a court is asked to interpret the terms of a contract, Florida

courts apply the rule of *lex loci contractus*, which requires that the court apply the law of the

jurisdiction where the contract was executed.  *State Farm Mut. Auto. Ins. Co. v. Roach*, 945 So.

2d 1160, 1163 (Fla. 2006).

In this case, neither the parties' pleadings, briefings, nor their respective exhibits

demonstrate where the contract was executed.  Although elements of the Policy suggest that it

may have been executed in Georgia, the face of the Policy is, itself, unclear.  Previously, this

Court found that Florida substantive law would control the action.  *See* Doc. 12 at 2.  To date,

neither party has objected to this finding.  Instead, the parties have argued their motions based on

Florida law, thereby stipulating "that Florida law applies in this case."  *Medalie v. FSC Sec.*

*Corp.*, 87 F. Supp. 2d 1295, 1297 & n.1 (S.D. Fla. 2000); *see also Pulte Home Corp. v. Osmose*

*Wood Preserving, Inc.*, 60 F.3d 734, 739 n.15 (11th Cir. 1995).  Accordingly, the Court shall

apply Florida law in analyzing the parties' rights and obligations under the Policy.

In this case, the parties do not dispute that the Policy constituted a valid contract for

insurance between the Diocese and OneBeacon.  The parties also do not dispute that both the

Diocese and Brown were insured pursuant to the terms of the Policy.  However, the parties

dispute whether OneBeacon owed a duty to defend Brown and/or the Diocese.  Doe argues that,

pursuant to Florida law as well as the allegations in the Underlying Complaint, OneBeacon owed

both Brown and the Diocese a duty to defend.  OneBeacon, on the other hand, argues that the

allegations raised in the Underlying Complaint were not sufficient to satisfy the Policy definition

of occurrence.  Thus, even though OneBeacon provided a defense under a reservation of rights to

the Diocese, it argues that it was never required to defend either the Diocese or Brown.  Finally,

the parties dispute whether OneBeacon owes a duty to indemnify the Diocese for the underlying

settlement.  OneBeacon argues that by taking control of the litigation and settling the claims after

initially accepting OneBeacon's defense, the Diocese breached its duty to cooperate.  Doe argues

that by refusing to settle the underlying claims against the Diocese, OneBeacon provided an

inadequate defense and/or changed the material terms of the defense, thereby breaching its duty

to defend and entitling the Diocese to take control of the litigation.

## A.  DUTY TO DEFEND

First, concerning the duty to defend, the Florida Supreme Court has indicated that "an

insurer's duty to defend its insured against a legal action arises when the complaint alleges facts

that fairly and potentially bring the suit within policy coverage."  *Jones v. Fla. Ins. Guar. Ass'n,*

*Inc.*, 908 So. 2d 435, 442–43 (Fla. 2005).  The duty is triggered/determined based on the

allegations raised in the complaint, and the "insurer must defend even if the allegations in the

complaint are factually incorrect or meritless."  *Id.* at 443.  The Court must resolve any doubts

regarding the duty to defend in favor of the insured.  *Harford Accident & Indem. Co. v. Beaver*,

466 F.3d 1289, 1292 (11th Cir. 2006).

However, "where the complaint upon its face alleges a state of facts which fails to bring

the case within the coverage of the policy," the insurer owes no duty to defend the suit.

*Capoferri v. Allstate Ins. Co.*, 322 So. 2d 625, 627 (Fla. 3d DCA 1975).  Even reading the

underlying allegations fairly and in favor of the insured, artful wording of the complaint will not, alone, trigger an insurer's duty to defend.  *State Farm Fire and Cas. Co. v. Tippett*, 864 So. 2d 31, 35 (Fla. 4th DCA 2003).  More specifically, "where the alleged facts establish intentional conduct, but the claim alleges negligence, the negligence label should be disregarded.  While a wolf in sheep's clothing presents a clever disguise[,] it is still a wolf."  *Hatmaker v. Liberty Mut. Fire Ins. Co.*, 308 F. Supp. 2d 1308, 1316 (M.D. Fla. 2004).

In this case, the Underlying Complaint raised a variety of allegations against both Brown and the Diocese.  The Court will consider separately the claims against Brown and the Diocese and whether those claims triggered OneBeacon's duty to defend.

### 1) Brown Allegations

First, concerning Brown, the Underlying Complaint raised claims almost entirely based on Brown's sexual molestation of Doe, a minor at that time.  The Policy provided coverage for bodily injuries caused by an "occurrence," which was defined as "an accident . . . which results in bodily injury or property damage neither expected nor intended from the standpoint of the insured."  Accordingly, for OneBeacon to owe Brown a duty to defend, Brown must have neither intended nor expected the bodily injury that resulted from the sexual molestation of a minor.

However, Florida law has recognized "that an intent to injure is inherent in the act of sexually abusing a child."  *Prudential Prop. and Cas. Inc. Co. v. Swindal*, 622 So. 2d 467, 472 (Fla. 1993) (citing *Landis v. Allstate Ins. Co.*, 546 So. 2d 1051 (Fla. 1989)).  "Indeed, overwhelming precedent establishes that acts of child molestation are, as a matter, of law, considered to be intentional and therefore outside the scope of an 'occurrence' for insurance coverage purposes."  *Ranta v. Catholic Mut. Relief Soc'y of Am.*, 492 F. App'x 373, 376 (4th Cir. 2012) (citing *Mfr. & Merch. Mut. Ins. Co. v. Harvey*, 498 S.E.2d 222, 226 (S.C. Ct. App. 1998)

for the proposition that at least forty-one states have, to date, found that acts of child molestation carry the presumption of intent to inflict injury).  Because the underlying allegations against Brown "carry the inferred intent to harm [Doe], the acts alleged against Brown are not 'occurrences' and, therefore," do not impose upon OneBeacon a duty to defend Brown.  *Id.* Furthermore, because OneBeacon owed no duty to defend Brown, it also owed no duty to indemnify Brown.  *See Phila. Indm. Ins. Co. v. Yachtsman's Inn Condo Ass'n, Inc.*, 595 F. Supp. 2d 1319, 1322 (S.D. Fla. 2009) (finding that if a court determines that the insurer has no duty to defend, then the insurer also has no duty to indemnify).

Doe appears to concede that the allegations of intentional molestation raised against Brown would not constitute an occurrence under the Policy.  However, he instead argues that the Underlying Complaint raised several allegations of negligence "separate and apart form the claims of sexual molestation" that would constitute occurrences.  *See* Doc. 77 at 7, 13. Specifically, the Underlying Complaint alleged that Brown negligently failed to warn Doe and/or Doe's family of Brown's deviant sexual proclivities, and otherwise failed to exercise due care for the safety and well-being of Doe.  *See* Doc. 77, Ex. A at 26–29.  It further alleged that Brown, as a Priest who held a relationship of trust and confidence with Doe, and who offered Doe religious counseling and guidance, owed Doe certain fiduciary duties, but breached those duties as a result of his actions.  *See id.* at 29–30.

However, Doe fails to establish how such allegations are distinguishable form the intentional molestation.  Although not binding on this Court, the Fourth Circuit addressed this exact issue in considering a different claim brought against Wayland Yoder Brown for the sexual molestation of Allan Carl Ranta.  *See Ranta*, 492 F. App'x at 376.  There, Ranta argued that "Brown knew or should have known he was a danger to children, yet failed to protect Ranta

from him, thereby breaching his fiduciary duties as a priest." *Id.* Ranta contended that such

conduct constituted negligence, which would trigger coverage under the relevant policy. *Id.*

The Fourth Circuit rejected this argument, finding that "Ranta's attempt to recharacterize

Brown's egregious acts of child rape and sexual molestation as negligence [did] not render

Brown's conduct accidental." *Id.*

Given the similarities between the factual allegations presented against Brown in the

Ranta case and those at issue in this case, the Court finds the Fourth Circuit's conclusion

persuasive. However, even without adopting the reasoning of the Fourth Circuit, an examination

of the Underlying Complaint shows that each claim of negligence raised against Brown is

explicitly based on and/or derivative of the alleged intentional acts.

First, although Count V of the Underling Complaint, titled "Negligence/Gross

Negligence/Recklessness," asserts a variety of duties related to Brown's failure to warn and/or

protect Doe, the Count begins with a paragraph asserting that Brown "sexually assaulted" Doe

on multiple occasions in 1978. *See* Doc. 77, Ex. A at 26, ¶ 145. Similarly, although Count VI

generally alleges negligence and that Brown breached certain fiduciary duties, it explicitly states

that the breaches occurred "[a]s a result of Brown's predatory acts . . . ." *Id.* at 29, ¶ 150. Just as

in *Ranta*, such is nothing more than a recharacterization of Brown's egregious acts of child rape

and sexual molestation. *See also Foremost Ins. Co. v. D.R. and D.M.*, 83 So. 3d 777, 777 (Fla.

5th DCA 2011) (finding that where all the causes of action asserted in a complaint "are based

upon the factual contention that [the insured] had unlawful and inappropriate sexual relations

and contact with [a minor]," such claims, however labeled, are clearly excluded).

In short, the Court finds that the underlying allegations of negligence and breach of

fiduciary duties against Brown constitute nothing more than an attempt to disguise the

underlying intentional harm so as to bring the claim within the purview of the Policy's coverage. Under Florida law, Doe may not trigger OneBeacon's duty to defend by artfully wording his allegations of intentional molestation in terms of various duties and breaches. *State Farm Fire and Cas. Co. v. Tippett*, 864 So. 2d 31, 35 (Fla. 4th DCA 2003). Because the alleged facts established intentional conduct, the negligence label must be disregarded. *See Geovera Specialty Ins. Co. v. Hutchins*, 831 F. Supp. 2d 1306, 1313 (M.D. Fla. 2011). Consequently, OneBeacon owed no duty to defend Brown. Because it owed no duty to defend, it also owed no duty to indemnify Brown. *See Phila. Indem. Ins. Co. v. Yachtman's Inn Condo Ass'n, Inc.*, 595 F. Supp. 2d 1319, 1322 (S.D. Fla. 2009). Accordingly, as to Doe's instant claims regarding Brown, OneBeacon is entitled to a final summary judgment in its favor.

## 2) *The Diocese Allegations*

Turning next to the Diocese, OneBeacon argues that the Underlying Complaint established that the Diocese had actual knowledge of Brown's conduct with, affinity for, and danger to young boys, and that, despite such knowledge, the Diocese failed to protect Doe from Brown. *See* Doc. 76 at 22. Stated differently, OneBeacon argues that the Underlying Complaint alleged that the Diocese held actual knowledge of Brown's sexual proclivities towards minors yet failed to take proper remedial actions. According to OneBeacon, such does not constitute an occurrence under the Policy.

Doe, however, argues that the Underlying Complaint alleged that the Diocese either knew or should have known of Brown's sexual proclivities. In other words, the Underlying Complaint alleged in the alternative both actual and constructive knowledge. Further, Doe argues that by raising claims for negligent hiring, retention, and supervision against the Diocese, the Underlying Complaint satisfied the definition of an occurrence.

An examination of the Underlying Complaint shows that both parties are correct, at least in part.  Concerning OneBeacon's position, the Underlying Complaint contains numerous allegations tending to show that the Diocese had actual knowledge of Brown's danger to children.  For example, between 1972 and Brown's ordination as a Priest in 1977, the Diocese was repeatedly warned, notified, and advised by clergy and others regarding Brown's danger to children.  *See* Doc. 77, Ex. A at 8–11.  Likewise, Brown allegedly admitted that he had committed "various indiscretions with minor boys."  *Id.* at 9, ¶ 53.  Finally, the Diocese even received reports that Brown traumatized one minor boy and caused another to require "psychological care."  *Id.* at 10, ¶ 59.

However, as to Doe's position, the Underlying Complaint also repeatedly alleged that the Diocese merely "knew or should have known" about Brown's inappropriate conduct and dangerous propensities regarding young boys.  *See id.* at ¶¶ 44, 47, 122, 130, 131, 146.  Likewise, the Underlying Complaint ultimately alleged claims against the Diocese for negligent hiring, retention, and supervision of Brown, asserting in each such claim alternative allegations of both actual and constructive knowledge.  *See id.* at Counts II, III.

Under Florida law, an "employer's alleged history of deliberate indifference to a known wrong being perpetrated against the plaintiff foreclose[s] the . . . contention that the [wrong] was 'unexpected' and hence, an 'occurrence' under the policy."  *Sunshine Birds and Supplies, Inc. v. U.S. Fid. and Guar. Co.*, 696 So. 2d 907, 911 (Fla. 3d DCA 1997).  However, by pleading that an employer either knew or should have known of an employee's proclivities in general to molest young children, the pleading suggests two alternatives: either the employer "actually knew of the potential for child abuse . . . and acted indifferently to this situation, or alternatively, the [employer] had no actual knowledge of the abuse but with the exercise of due care, could

have learned of the same and taken remedial steps to prevent the victimization." *Id.*  While the former of these alternatives would, if proven, not qualify as an occurrence, the latter, if proven, would trigger a duty to indemnify.  *Id.*

Accordingly, where a plaintiff pleads alternatively that the insured employer had actual or constructive knowledge of its employee's proclivity in general to molest young children, such allegations may qualify as an occurrence and, thus, trigger an insurer's duty to defend.  *Id.*  In this case, by alleging that the Diocese knew or should have known about Brown's inappropriate conduct and dangerous propensities regarding young boys, the Underlying Complaint effectively triggered OneBeacon's duty to defend.  Likewise, by asserting claims against the Diocese based on these alternative allegations for negligent hiring, retention, and supervision, the Underlying Complaint satisfied the definition of an occurrence.  *See U.S. Fid. & Guar. v. Toward*, 734 F. Supp. 465, 467–70 (S.D. Fla. 1990) (finding that allegations against an employer for negligent hiring, retention, and supervision of a child molester qualified as "an accident . . . which results in bodily injury . . . neither expected nor intended from the standpoint of the insured").

In this case, OneBeacon did in fact provide a defense to the Diocese, subject to a complete reservation of rights, which the Diocese accepted.  OneBeacon, however, now argues that it is not obligated to indemnify the Diocese.  Specifically, by engaging in settlement negotiations in spite of OneBeacon's explicit instructions to the contrary, and by otherwise taking control of the litigation after initially accepting OneBeacon's defense, the Diocese breached its duty to cooperate, thereby relieving OneBeacon of its duty to indemnify. OneBeacon further argues that the underlying settlement agreement constitutes a voluntary payment under the Policy for which OneBeacon has no indemnification obligation.

Doe, however, claims that the Diocese was entitled to take control of the defense and

engage in settlement negotiations in light of OneBeacon's instructions regarding settlement and mediation.  Doe argues that by prohibiting the Diocese from attending mediation and/or engaging in settlement negotiations, OneBeacon failed to provide an adequate defense and/or materially changed the terms of the defense.  Doe further argues that such actions constitute a breach of OneBeacon's duty to defend.

## B.  DUTY TO COOPERATE AND VOLUNTARY PAYMENTS

As alluded to above, under Florida law, an insurer's duty to defend "is separate and distinct from its duty to indemnify, and is more extensive."  *First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.*, 695 So. 2d 475, 476 (Fla. 3d DCA 1997).  "[A]n insurer is obligated to defend a claim even if it is uncertain whether coverage exists under the policy."  *Id.*  However, because an insurer may not lawfully refuse to defend even where coverage is suspect, "an insurer may provide a defense under a reservations [sic] of rights."  *Id.* at 476–77.  Accordingly, an offer to defend subject to a reservation of rights "does not constitute a wrongful refusal to defend." *Cont'l Cas. Co. v. City of Jacksonville*, 283 F. App'x 686, 690 (11th Cir. 2008).

Where an insurer offers to defend pursuant to a reservation of rights, the insured initially retains the "right to reject the defense and hire its own attorneys and control the defense." *Bellsouth Telecomm., Inc. v. Church & Tower of Fla., Inc.*, 930 So. 2d 668, 671–72 (Fla. 3d DCA 2006).  However, by accepting and not rejecting an insurer's fully-funded defense, the insured agrees to leave control of the defense in the insurer's hands.  *Cont'l Cas. Co.*, 283 F. App'x at 690.  Where an insured has accepted a defense subject to a reservation of rights, the insured may not subsequently "wrest control of the defense and bind the insurer to [a] settlement."  *Zurich Am. Ins. Co. v. Frankel Enters., Inc.*, 509 F. Supp. 2d 1303, 1312 (S.D. Fla. 2007); *see also Am. Reliance Ins. Co. v. Perez*, 712 So. 2d 1211, 1212–13 (Fla. 3d DCA 1998).

Instead, the insured must cooperate with the insurer's defense throughout the litigation.  *Cont'l Cas. Co.*, 283 F. App'x at 690.

In this case, the Policy provided that "[t]he insured shall cooperate with the Company and, upon the Company's request, assist in making settlements [and] in the conduct of suits . . . . The insured shall not, except at his own cost, voluntarily make any payment, assume any obligation or incur any expense other than for first aid to others at the time of the accident." Doc. 79, Ex. A at 64.  Such cooperation clauses are intended to "protect the insurer from collusion between the insured and injured third parties, while making it possible for the insurer to conduct a proper investigation of the claim, and determine its own obligations." *Cont'l Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1339 (M.D. Fla. 2007) (citing *Hudson Tire Mart, Inc. v. Aetna Cas. & Sur. Co.*, 518 F.2d 671, 674 (2d Cir. 1975); *Martin v. Travelers Indem. Co.*, 450 F.2d 542, 553 (5th Cir. 1971); *Farmers Cas. Co. v. Green*, 390 F.2d 188, 191 (10th cir. 1968)).

Florida law has recognized that "an insurer may deny coverage and avoid payment of compensation to the victim of the insured's tort where the insured has been guilty of lack of cooperation . . . ." *Ramos v. Nw. Mut. Ins. Co.*, 336 So. 2d 71, 75 (Fla. 1976).  However, "[n]ot every failure to cooperate will release the insurance company.  Only that failure which constitutes a material breach and substantially prejudices the rights of the insurer in defense of the cause will release the insurer of its obligation to pay." *Id.*  Further, the insurer must have "exercised diligence and good faith in seeking to bring about the cooperation of the insured," and must have complied in good faith with the terms and conditions of the policy. *Id.*  While "[t]he question of whether the failure to cooperate is so substantially prejudicial as to release the insurance company of its obligation is ordinarily a question of fact, . . . under some

circumstances, particularly where the facts are admitted, it may well be a question of law." *Id.*

In short, to excuse itself from its obligations under the Policy, including the duty to indemnify, OneBeacon must demonstrate the following: (1) the Diocese failed to cooperate; (2) the lack of cooperation was material; (3) OneBeacon suffered substantial prejudice as a result of the Diocese's failure to cooperate; and (4) OneBeacon exercised diligence and good faith in trying to bring about the Diocese's cooperation. *Cont'l Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1339 (M.D. Fla. 2007).

In this case, the record shows that throughout the underlying litigation, Resolute, acting on behalf of OneBeacon, explicitly advised the Diocese to refrain from engaging in mediation and/or settlement negotiations with Doe. *See* Doc. 79, Ex. F; *see also* Doc. 79, Exs. C, D, L. Despite this, the Diocese continued to engage Doe in settlement negotiations, without OneBeacon's consent, knowledge, or participation. *See, e.g.*, Doc. 79, Ex. E at 22–31, 33–35; Ex. H; Doc. 93 ¶ 10. Ultimately, the Diocese and Doe agreed to settle the case, assigning to Doe the Diocese's rights against OneBeacon, and setting the total amount of damages at $5 million, of which the Diocese paid $2.5 million. *See* Doc. 79, Ex. N at 3; Ex. E at 45–47.

In short, the Diocese "materially breached the express language in the cooperation clause by settling the case without [OneBeacon's] consent and over [OneBeacon's] express objections." *Cont'l Cas. Co. v. City of Jacksonville*, 283 F. App'x 686, 692 (11th Cir. 2008). The settlement terms alone—a $5 million consent judgment including the assignment to Doe of all of the Diocese's rights against OneBeacon—was substantially prejudicial to OneBeacon. *Id.* OneBeacon's lack of involvement in the December 2010 settlement negotiations further magnified such prejudice. Although the Diocese notified OneBeacon of these settlement negotiations via attorney Barrow's letter dated December 8, 2010, the letter acted merely as an

ultimatum. Either OneBeacon would tender its Policy limits or the Diocese would unilaterally "make the best deal" it could with Doe, even if "that [meant] settling the case in excess of the insurance coverage limits" and assigning to Doe the Diocese's rights against OneBeacon. *See* Doc. 79, Ex. J. Effectively, the letter limited OneBeacon's participation in the litigation to only these two options, neither of which provided for the possibility that OneBeacon could participate in any substantive settlement negotiations. By so limiting Onebeacon's control of the settlement and, therein, the defense, the Diocese not only failed to cooperate with OneBeacon's defense, but substantially prejudiced OneBeacon's right to control the defense.

Finally, concerning the fourth element, an insurer "must in good faith employ methods that are reasonably calculated to locate the insured and secure its cooperation." *Cont'l Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1339 (M.D. Fla. 2007); *see also First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.*, 695 So. 2d 475 (Fla. 3d DCA 1997). In *Continental Casualty Company v. City of Jacksonville*, the Middle District of Florida provided the following detailed research concerning when an insurer fails to exercise due diligence in fostering cooperation:

> There is a paucity of Florida law on the subject of what exactly constitutes diligently attempting to foster cooperation under the cooperation clause, but what little the Court and the parties have located is consistent with authority from other states. As such, it has been held that an insurer fails to exercise due diligence in fostering cooperation when an insurer fails to notify an insured of the necessity to attend trial. *Hannig v. Hartford Accident & Indem. Co.,* 342 Ill. App. 539, 544–45, 97 N.E.2d 476, 478–79 (Ill. App. Ct. 1951). An insurer fails to exercise due diligence when its efforts are perfunctory and minimal. *Shelter Mut. Ins. Co. v. Page,* 316 Ark. 623, 873 S.W.2d 534, 537 (1994) (finding that the insurer did not satisfy requirement when it failed to investigate accident, failed to contact the insured through its employer, and merely attempted to call insured at previous address or drive by insured's former house). An insurer's efforts are also deemed insufficient when it provides untimely or inadequate notice of trial to its insured. *Rosalez v. Unigard Ins. Co.,* 283 Or. 63, 581 P.2d 945 (1978) (insurer failed to provide insured actual notice of trial). An insurer exercises due diligence when it

instructs insured to notify it if a suit is filed so that it can re-evaluate its position and determine whether it owes a duty of defense with respect to a claim. *First Am. Title,* 695 So. 2d at 475. An insurer also satisfies its obligation to exercise due diligence in fostering cooperation when it takes steps to ensure that its insured knows that it is bound by the conditions of the insurance policies. *Kohne,* 181 Fed. Appx. at 892.

*Cont'l Cas. Co.*, 550 F. Supp. 2d at 1339–40.

In this case, throughout the underlying litigation, Resolute sent counsel for the Diocese numerous correspondence, either via letter or e-mail, informing the Diocese of OneBeacon's position with respect to settlement, specifically that OneBeacon was, at all relevant times, opposed to settlement as it lacked "critical information on key aspects of the claim" necessary to evaluate a settlement.  *See* Doc. 79, Ex. F; *see also* Docs. 79, Exs. C, D, L.  Resolute explicitly advised what such information would have entailed, including, *inter alia*, the potentially dispositive legal issues of choice-of-law and statute of limitations.  *See* Docs. 79, Exs. F, L.

Further, these communications explicitly advised the Diocese of the terms of the Policy and the Diocese's obligations under the Policy, including the cooperation clause and the voluntary payments clause.  *See, e.g.*, Docs. 79, Exs. C, D, F, L.  Regarding control of the litigation and settlement rights, Resolute's September 14, 2010 e-mail advised that the Diocese did not "have the right to unilaterally dictate how suits are defended and how claims are settled," but rather, such rights belonged to OneBeacon.  Doc. 79, Ex. F.  The e-mail explicitly advised that should the Diocese continue "ignoring OneBeacon's right to settle and defend" by proceeding with mediation over OneBeacon's express objections, OneBeacon "reserve[d] the right to disclaim coverage under the cooperation condition" and "regard any settlement entered into as a voluntary payment for which OneBeacon [would have] no indemnification obligation." *Id.*  Resolute reiterated these positions again in its letter dated December 10, 2010.  *See* Doc. 79,

Ex. L.

Moreover, the record demonstrates that the Diocese clearly understood OneBeacon's position.  In his e-mail dated September 15, 2010, attorney Brennan acknowledged OneBeacon's right to control the defense of the case and indicated that the Diocese had no intent to interfere with OneBeacon's defense and would "cooperate as required by the terms of the contract."  *See* Doc. 79, Ex. G; Ex. E at 21–22.  Likewise, in his deposition testimony, Brennan stated that OneBeacon had advised the Diocese "not to enter into any negotiations," including "[m]ediation or settlement discussions."  Doc. 79, Ex. E at 29–30.  Brennan further stated that he believed a settlement between the Diocese and Doe would violate the cooperation clause and render coverage under the Policy voidable.  *Id.* at 30–31, 33–35.  Consequently, as Brennan was defense counsel for the Diocese, the Diocese understood that it was OneBeacon's position that the Diocese could not settle without OneBeacon's consent.

Despite OneBeacon's attempts to remind the Diocese that it was bound by the terms of the Policy, the Diocese continued to unilaterally negotiate a settlement with Doe.  These negotiations were conducted without OneBeacon's involvement or even knowledge.  *See* Doc. 79, Ex. E at 29–30.  As of December 8, 2010, the Diocese and Doe had reached an agreement as to the dollar amount that the Diocese would contribute towards a settlement.  *See id.* at 38–39; Doc. 79, Ex. K at 1.  However, regardless of whether a settlement had been reached as to all material terms, attorney Barrow's December 8th letter clearly illustrated that a settlement would occur without OneBeacon's input.  *See* Doc. 79, Ex. J.

In short, OneBeacon's "efforts of repeatedly informing the [Diocese] that it was bound by the terms of the [Policy] were neither perfunctory nor minimal."  *Cont'l Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1341 (M.D. Fla. 2007) (citing *Shelter Mut. Ins. Co. v. Page*,

873 S.W.2d 534, 537 (Ark. 1994)).  OneBeacon made good faith efforts to communicate with the Diocese that it was bound by the terms of the Policy, and to remind the Diocese of the consequences of breaching those terms.  *Id.* (citing *Phila. Indem. Ins. Co. v. Kohne*, 181 F. App'x 888, 892 (11th Cir. 2006)).  This Court finds that OneBeacon exercised diligence and good faith in trying to bring about the Diocese's cooperation.

Accordingly, the record shows that there remains no genuine issue of material fact concerning the Diocese's duty to cooperate.  The Diocese's unilateral engagement in settlement negotiations, combined with the ultimatum imposed upon OneBeacon, constituted a material breach of the duty to cooperate.  In turn, the Diocese's breach relieved OneBeacon of its obligations under the Policy, including OneBeacon's duty to indemnify.  *See First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.*, 695 So. 2d 475, 477 (Fla. 3d DCA 1997).  Pursuant to the terms of the Policy, any payment made by the Diocese in satisfaction of the underlying settlement would be considered a voluntary payment, made at the Diocese's own cost, for which OneBeacon would have no indemnification obligation.  *See Am. Reliance Ins. Co. v. Perez*, 712 So. 2d 1211, 1213 (Fla. 3d DCA 1998) (finding that voluntary payment clauses require "the insured to obtain the insurer's consent before settling").

## C.  EXCEPTIONS TO THE DUTY TO COOPERATE

Doe does not appear to challenge the conclusion that the Diocese failed to cooperate with OneBeacon's defense, or that the Diocese's failure to cooperate was neither material nor substantially prejudicial.  Instead, Doe argues that as a result of OneBeacon's refusal to settle the underlying claims, the Diocese was free to reject OneBeacon's defense, take control of the defense, and engage Doe in unilateral settlement negotiations.  Specifically, Doe argues that OneBeacon's refusal to settle constituted either (1) a breach of its alleged duty to adequately

defend, or (2) a material change in the terms and conditions of the defense.  Doe argues that

under either conclusion, the Diocese was free to take control of the litigation without violating

the duty to cooperate.

### 1) Inadequate Defense

As noted above, OneBeacon owed a duty to defend the Diocese in the underlying claim.

Pursuant to Florida law, "'if an insurance company breaches its contractual duty to defend, the

insured can take control of the case, settle it, and then sue the insurance company for the

damages incurred in settling the action.'"  *Kopelowitz v. Home Ins. Co.*, 977 F. Supp. 1179, 1186

(S.D. Fla. 1997) (quoting *MCO Envtl., Inc. v. Agric. Excess & Surplus Ins. Co.*, 689 So. 2d 1114,

1115 (Fla. 3d DCA 1997)).  "To satisfy its obligation to defend, an insurer must provide an

adequate defense."  *Allstate Ins. Co. v. Levesque*, 263 F.R.D. 663, 668 (M.D. Fla. 2010) (citing

*Carrousel Concessions, Inc. v. Fla. Ins. Guar. Ass'n*, 483 So. 2d 513, 516 (Fla. 3d DCA 1986)).

Although Florida courts have not explicitly defined the parameters of what constitutes an

"adequate" defense, they have recognized that the duty to defend, including the duty to

adequately defend, "arises solely from the language of the insurance contract[,]" specifically

"[w]here the insurer acts negligently in performing its duty."  *Carrousel Concessions, Inc.*, 483

So. 2d at 516.  "Such a breach can be determined objectively from the insurance contract itself

without inquiry into whether the insurer acted in good faith or bad faith."  *Id.*

However, typically, claims in Florida based on an insurer's wrongful refusal to settle are

brought pursuant to a theory of bad faith.  Where an insured "has surrendered all control over the

handling of the claim, including litigation and settlement, . . . the duty of good faith arises."

*Liberty Mut. Ins. Co. v. Precisionaire, Inc.*, 8:00-CV-1971-T-17EAJ, 2006 WL 905389, at *7

(M.D. Fla. Apr. 7, 2006).  In turn, a duty to settle in good faith arises.  *Id.* (citing *Liberty Mutual*

*v. Davis*, 412 F.2d 475 (5th Cir. 1979)).  Such claims center on whether the insurer places its

own interests ahead of the interests of its insured.  *See Maldonado v. First Liberty Ins. Corp.*,

546 F. Supp. 2d 1347, 1353 (S.D. Fla. 2008) ("[T]he essence of an insurance bad faith claim is

that the insurer acted in its own best interests, failed to properly and promptly defend the claim,

and thereby exposed the insured to an excess judgment.").

      Florida courts have recognized that the standard for determining the liability of an insurer

for failure to settle in an excess judgment case is bad faith, as opposed to negligence.  *See*

*DeLaune v. Liberty Mut. Ins. Co.*, 314 So. 2d 601, 603 (Fla. 4th DCA 1975); *see also Campbell*

*v. Gov't Emps. Ins. Co.*, 306 So. 2d 525, 530 (Fla. 1974).  Conversely, as noted above, a breach

of the duty to adequately defend arises "[w]here the insurer acts negligently in performing its

duty." *Carrousel Concessions, Inc. v. Fla. Ins. Guar. Ass'n*, 483 So. 2d 513, 516 (Fla. 3d DCA

1986).  Combining these two principles suggests that, under Florida law, an action for an

insurer's alleged breach of the duty to adequately defend may not lie where the insured's claims

stem from an alleged wrongful refusal to settle in an excess judgment case.  While the standard

for determining liability for an insurer's failure to settle is bad faith and *not* negligence, the

standard for determining a breach of the duty to adequately defend *is* negligence.  *Compare*

*DeLaune*, 314 So. 2d at 603, *with Carrousel Concessions, Inc.*, 483 So. 2d at 516.

      However, in at least one opinion, the Eleventh Circuit, applying Florida law, concluded

that the duty to adequately defend may extend, under certain circumstances, to a claim for a

wrongful refusal to settle.  In *Ernie Haire Ford, Inc. v. Universal Underwriters Ins. Co.*, 331 F.

App'x 640 (11th Cir. 2009), the insurer, Universal, provided a defense to the insured, Crown,

subject to a reservation of rights.  *Id.* at 643.  At all relevant times during the underlying

litigation, Universal believed that the policy at issue provided Crown with an aggregate coverage

limit of $500,000.  *Id.*  On two separate occasions, the case was unsuccessfully mediated.  "On both occasions, Universal recommended settlement and offered to pay $500,000, which it believed to be the policy limit."  *Id.* at 643–44.  Ultimately, the case settled for over $1.1 million. *Id.* at 644.  In a subsequent declaratory action, the district court found that Universal had made a mistake regarding the correct amount of coverage and that the policy limits exceeded the $500,000 figure.  *Id.* at 644.  In light of this ruling, Crown argued that Universal's refusal to settle for an amount greater than $500,000 constituted a breach of Universal's duty to adequately defend.  *Id.*

On appeal, the Eleventh Circuit found that "Crown could establish a valid claim for breach of a contractual duty to defend based on Universal's refusal to settle."  *Id.*  The court based this conclusion on the analysis in *Carrousel Concessions*, which, as noted above, found that "whether an insurer breached its duty to defend 'can be determined objectively from the insurance contract itself without inquiry into whether the insurer acted in good faith or bad faith.'"  *Id.* (quoting *Carrousel Concessions, Inc.*, 483 So. 2d at 516).  The Eleventh Circuit concluded that sufficient issues of material fact existed as to the duty to defend issue, specifically whether Universal's mistaken belief as to the policy's limits constituted a wrongful denial of coverage.  *Id.*

In other words, in finding that the insurer could establish a valid claim for a breach of the duty to defend based on the insurer's refusal to settle, the Eleventh Circuit limited its analysis to objective evidence from the insurance contract itself, i.e., the policy limits.  An analysis of whether Universal refused to settle because of its mistaken belief regarding the policy limits would not require an analysis of any subjective bad faith evidence.  Thus, in analyzing a claim for a breach of the duty to adequately defend for a wrongful refusal to settle, courts should look

to whether the claim may be established objectively from the insurance contract itself. *See Carrousel Concessions, Inc.*, 483 So. 2d at 516. If the analysis would require a determination of whether the insurer acted in good faith or bad faith, then a valid claim for breach of the duty to defend does not exist. Instead, such would constitute a bad faith claim for wrongful refusal to settle.

Turning to the facts of this case, Doe fails to show how his claim for breach of the duty to adequately defend may be determined objectively from the insurance contract itself without inquiry into whether OneBeacon acted in good faith or bad faith. Doe, instead, supports his position by pointing to various pieces of subjective evidence that do not derive from the Policy itself. First, Doe highlights the deposition testimony of both Doe's underlying counsel, W. Charles Hughes, and the Diocese's counsel, Brennan. Both opined that the potential monetary exposure in the case would exceed the $300,000 Policy limits. *See* Doc. 77, Ex. P at 40; Doc. 80, Corrected Ex. Q at 61. Second, Doe notes that attorney Weedon had provided OneBeacon with a valuation of the case at $1.5 million. *See* Doc. 77, Ex. K at 1. Further, Doe argues that defense counsel Brennan was so adamant that the case should settle that he took the initiative to unilaterally schedule a mediation for September 17, 2010 without OneBeacon's consent. *See id.*; *see also* Doc. 77, Ex. M. Despite this information, OneBeacon refused to provide the Diocese with consent to engage in mediation and/or settlement negotiations, and instructed Brennan to cancel the mediation. *See* Doc. 77, Ex. K. Doe argues that such actions constituted a breach of OneBeacon's duty to provide the Diocese with an adequate defense.

Inherently, the opinions and/or advise of counsel do not constitute objective evidence derived from the Policy itself. Instead, such evidence is subjective in nature and goes toward whether OneBeacon acted in good faith in handling the settlement negotiations in the underlying

case.  This conclusion is highlighted by OneBeacon's consistent response to the Diocese's requests to engage in settlement negotiations.  Specifically, OneBeacon claimed that it lacked critical information necessary to evaluate settlement and, moreover, believed that there existed legal arguments that could preclude liability altogether, including jurisdictional, choice-of-law, and statute of limitations arguments.  *See, e.g.*, Doc. 79, Ex. L.  The legitimacy of these sentiments goes not towards any objective evidence from the Policy itself, but rather the subjective evidence of whether OneBeacon was placing its own interests ahead of those of the Diocese, thereby exposing the Diocese to an excess judgment.  Such an issue sounds as a claim for bad faith rather than one for a breach of the duty to defend.  *See, e.g.*, *Bos. Old Colony Ins. Co. v. Guiterrez*, 386 So. 2d 783, 785 (Fla. 1980); *Maldonado v. First Liberty Ins. Corp.*, 546 F. Supp. 2d 1347, 1353 (S.D. Fla. 2008)

  Moreover, at various points throughout the underlying litigation, counsel for both the Diocese and Doe seemed to acknowledge this conclusion.  For example, in his e-mail to Resolute dated September 15, 2010, defense counsel Brennan framed the issue as whether OneBeacon would consider the interests of the Diocese as paramount to its own interests.  Doc. 79, Ex. G.  Likewise, in a letter to Resolute dated October 27, 2010, defense counsel Barrow argued that the only reason for OneBeacon's refusal to allow the Diocese to mediate was that OneBeacon was placing its own financial interests over those of the Diocese.  Doc. 92, Ex. 1 at 2–4.  Barrow concluded that such constituted "the very definition of bad faith."  *Id.*  Barrow reiterated these arguments in a second letter to Resolute dated December 8, 2010, in which he contended that OneBeacon's actions regarding settlement amounted to a "breach of fiduciary duty and bad faith conduct."  Doc. 79, Ex. J at 2.  Finally, Doe's own counsel from the underlying litigation, Hughes, argued in a letter to Resolute, dated January 27, 2011, that OneBeacon had breached

certain duties owed to the Diocese.  Doc. 79, Ex. P at 1.  In support of this conclusion, Hughes

cited only one Florida case, *Farinas v. Fla. Farm Bureau Gen. Ins. Co.*, 850 So. 2d 555 (Fla. 4th

DCA 2003).  However, *Farinas* addresses a bad faith claim and not a breach of the duty to

adequately defend.  *Id.*

       In short, Doe's argument is clearly founded in Florida's case law concerning bad faith

claims and not claims for breaches of the duty to adequately defend.  As this Court has

previously acknowledged, "'a cause of action for bad faith refusal to settle does not accrue until

the insured has demonstrated a breach' of the express promise to insure made by the insurer."

Doc. 12 at 3 (quoting *O'Rourke v. Provident Life and Acc. Ins. Co.*, 48 F. Supp. 2d 1383, 1384

(S.D. Fla. 1999)); *see also Cont'l Cas. Co. v. City of Jacksonville*, 550 F. Supp. 2d 1312, 1336

(M.D. Fla. 2007) ("[A] 'bad faith' action for failing to settle a claim does not accrue until there is

a determination of whether the insurer is required to indemnify the insured.).  More importantly,

bad faith claims for wrongful refusal to settle shall not be considered until after an analysis of

whether a claim for breach of the cooperation clause releases an insurer from its obligations

under the insurance contract.  *Cont'l Cas. Co. v. City of Jacksonville*, 283 F. App'x 686, 691–92

(11th Cir. 2008).  Consequently, Doe's claim of bad faith wrongful refusal to settle may not

serve as a basis for arguing that OneBeacon breached its duty to defend, or as a defense to the

Diocese's breach of the cooperation clause.

## 2) *Material Change in the Terms of the Defense*

       As to Doe's second argument, an insured, after having previously accepted a defense

subject to a reservation of rights, may later reject the conditional defense if the insurer changes

the terms of the defense in a material way.  *See Mid-Continent Cas. Co. v. Am. Pride Bldg. Co.,

LLC*, 601 F.3d 1143, 1150 (11th Cir. 2010).  In this case, Doe argues that OneBeacon changed

the terms of the defense in a material way by failing to provide a defense comparable to that

provided in a similar case, *Allan Carl Ranta v. The Roman Catholic Diocese of Savannah, et al.*,

Case No. 2006-CP-27-143, in the Court of Common Pleas of the Fourteenth Judicial Circuit in

and for Jasper County, South Carolina.  *See* Docs. 77, 77, Ex. N.

In that case, Ranta, like Doe, sued the Diocese of Savannah, Lessard, Boland, and Brown,

alleging that between 1978 and 1982, Brown sexually assaulted Ranta, a minor at that time.  The

*Ranta* complaint set forth allegations and claims against both Brown and the Diocese nearly

identical to those asserted in Doe's case, including counts for Negligence/Gross

Negligence/Recklessnes, Breach of Fiduciary Duty, Intentional Infliction of Emotional Distress,

Fraudulent Concealment, Civil Conspiracy, and Negligent Retention or Supervision.  *Compare*

Doc. 77, Ex. N, *with* Doc. 79, Ex. B.  Doe claims that, as in this case, OneBeacon provided the

Diocese with a defense subject to a reservation of rights.  However, unlike this case, OneBeacon

allegedly agreed to extend "settlement authority to the insured in the amount of $175,000" and

did not "withhold its consent to the insured negotiating a reasonable settlement with [Ranta]."

Doc. 77, Ex. O.  Thereafter, the Diocese allegedly settled the Ranta Claim for an amount well in

excess of the policy limits.  *See* Doc. 77, Ex. G at 102.

Doe now argues that OneBeacon's defense of the Diocese in the *Ranta* case established a

course of conduct that served as a material term and/or condition of its defense in the underlying

case.  As an initial matter, Doe cites to no authority supporting the proposition that an insurer's

handling of the defense of its insured in one cause of action constitutes either a course of conduct

for the defense of any factually comparable case, or a material term of all such subsequent

defenses.  Instead, Doe cites only to *St. Joe Corp. v. McIver*, 875 So. 2d 375, 382 (Fla. 2004) for

the proposition that the conduct of parties subsequent to their entry into a contract can modify

the terms of the contract.  However, the *McIver* opinion also noted that "a party cannot modify a contract unilaterally.  All the parties whose rights or responsibilities the modification affects must consent."  *Id.*  In this case, Doe points to no evidence tending to show that OneBeacon consented to defending the Diocese in the underlying case in a manner comparable to the defense provided in *Ranta*.  Quite to the contrary, from the outset of the case, OneBeacon repeatedly reminded the Diocese of OneBeacon's right to control the litigation and that the Diocese was bound to both the cooperation clause as well as the voluntary payment clause.

Furthermore, Doe's own arguments show that significant differences existed between the *Ranta* matter and the underlying case.  For example, Doe claims that "ONEBEACON had admitted that the Ranta Claim would not resolve for the insurance policy limits" and had "evaluated the Ranta Claim . . . to be $3 to [$]5 million."  Doc. 77 at 19.  However, in the instant underlying case, OneBeacon did not admit that the claim would not resolve for the Policy limits.  Instead, OneBeacon explicitly disagreed with attorney Barrow's contention that the Policy limits were insufficient.  *See* Doc. 79, Ex. L at 3.  OneBeacon believed that legal arguments existed which could potentially preclude liability altogether.  *Id.* at 2–3.  Concerning valuation, OneBeacon repeatedly indicated that it lacked critical information necessary to make an evaluation of the case.  *See id.*; *see also* Doc. 79, Ex. F at 1.  It explicitly stated that it could not agree with a $1.5 million settlement value assigned by defense counsel Weedon.  *See id.* at 2.

Thus, even assuming *arguendo* that an insurer's defense in one litigation could constitute a course of conduct for subsequent litigation, Doe has failed to establish that the *Ranta* matter was sufficiently comparable to the facts of the underlying case so as to warrant a comparable approach to settlement.  Accordingly, OneBeacon did not change the terms of its defense in a material way by approaching settlement in the underlying case differently than it did in the

*Ranta* matter.

In short, the undisputed facts, taken in a light most favorable to Doe, fail to establish that OneBeacon either (1) provided the Diocese with an inadequate defense, in violation of OneBeacon's duty to defend; or (2) changed the terms of its defense of the underlying litigation in a material way.  Accordingly, the Diocese was not entitled to reject OneBeacon's defense, take control of the litigation, and/or engage in unilateral settlement negotiations.  By so breaching the cooperation clause, the Diocese relieved OneBeacon of its obligations under the Policy, including its duty to indemnify.  *See First Am. Title Ins. Co. v. Nat'l Union Fire Ins. Co.*, 695 So. 2d 475, 477 (Fla. 3d DCA 1997).

As one final consideration, Count II of Doe's Complaint claims that OneBeacon breached the Policy by "denying coverage, failing to act in good faith, and by unreasonably refusing to participate in meaningful settlement negotiations with the Plaintiff."  Doc. 1, Count II. However, aside from the arguments and evidence concerning inadequate defense and material change in terms/conditions, Doe has proffered no arguments or evidence tending to show that OneBeacon otherwise breached its duties under the Policy.  Thus, the Court finds that summary judgment should be entered in OneBeacon's favor as to Count II.

CONCLUSION

To summarize, the Court finds that there are no genuine issues of material fact, that the parties are proceeding on the same legal theories and relying on the same material facts, and that, as such, summary judgment should be entered.  *Shook v. United States*, 713 F.2d 662, 665 (11th Cir. 1983).  Each of the defendants named in the Underlying Complaint, including the Diocese of Savannah, Lessard, Boland, and Brown, were insured pursuant to the terms of the Policy. Concerning Brown, the allegations raised in the Underlying Complaint did not constitute an

occurrence as defined under the Policy.  Therefore, the Policy did not provide coverage for such claims and OneBeacon owed no duty to defend Brown.  Concerning the Diocese, the allegations raised in the Underlying Complaint did constitute an occurrence as defined under the Policy, to the extent OneBeacon owed a duty to defend the Diocese.  OneBeacon satisfied its duty to provide a defense to the Diocese and did not breach its duties under the Policy.  However, by improperly rejecting OneBeacon's defense, taking control of the litigation, and engaging in unilateral settlement negotiations that ultimately led to settlement, the Diocese breached both the cooperation clause and the voluntary payment clause of the Policy, thereby relieving OneBeacon of its obligations under the Policy, including its duty to indemnify.

Accordingly, it is hereby

**ORDERED AND ADJUDGED**:

1.      As to Count I of the Complaint, Plaintiff's motion for partial summary judgment (doc. 77) and Defendant's motion for summary judgment (doc. 76) are both GRANTED IN PART AND DENIED IN PART.  Concerning the rights of the Diocese of Savannah, Lessard, Bolland, and Brown under the Policy, there are no genuine issues of material fact outstanding and both parties are entitled to summary judgment as noted herein.  The Court declares the parties' rights and obligations under the Policy to be as follows:

    (a)      The Diocese of Savannah, Lessard, Bolland, and Brown were each insured under the Policy.

    (b)      The allegations raised against Brown in the Underlying Complaint were not occurrences under the Policy and, therefore, OneBeacon owed no duty to defend Brown.

    ©      The allegations raised against the Diocese of Savannah, Lessard, and Bolland in the Underlying Complaint were occurrences under the Policy and, therefore, OneBeacon owed a duty to defend the Diocese of Savannah, Lessard, and Bolland.

    (d)      The Diocese of Savannah, Lessard, and Bolland materially breached the cooperation clause and the voluntary payment clause under the Policy, so as to relieve OneBeacon of its obligations under the Policy, including its

duty to indemnify.

2.      Concerning the breach of contract alleged in Count II of the Complaint, Plaintiff's motion for partial summary judgment (doc. 77) is DENIED and Defendant's motion for summary judgment (doc. 76) is GRANTED.

3.      Plaintiff's remaining abated claims in Counts II, III, and IV of the Complaint are DISMISSED WITH PREJUDICE.

4.      The Clerk is directed to enter final judgment in favor of OneBeacon, and to close the file.

**DONE AND ORDERED** this __*9th*__ day of October, 2014

*s/Maurice M. Paul*

Maurice M. Paul, Senior District Judge